# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

**ABDULHAKIM MUHAMMAD**
**ADC #150550**                                                    **PLAINTIFF**

**v.**                          **Case No.  5:15-cv-130-KGB/PSH**

**MARK WHEELER,** *et al*.                                   **DEFENDANTS**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for trial.  Plaintiff Abdulhakim Muhammad was represented by counsel, and defendants Joshua Mayfield, the Religious Service Administrator for the Arkansas Department of Correction ("ADC");[1] Jeremy Andrews, Warden of the ADC's East Arkansas Regional Unit; and Wendy Kelley, Director of the ADC, were represented by counsel. Pursuant to Federal Rule of Civil Procedure 52(a), after conclusion of the trial, the Court makes the following specific findings and conclusions:

1.      Mr. Muhammad, a Sunni Muslim and inmate with the ADC, brings this action, claiming that the meal plans offered by the ADC violate the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C.A. §§ 2000cc, *et seq.*, as well as the First and Fourteenth Amendments to the United States Constitution.

2.      Mr. Muhammad is a lifetime inmate in the custody of the ADC.  He is serving life without parole, 11 life sentences, and an additional 180 months (Dkt. No. 117, ¶16).

3.      He currently is incarcerated in administrative segregation at the ADC's East Arkansas Regional Unit (Dkt. No. 113, at 1).

---

[1]  Since Mr. Muhammad filed his lawsuit, Joshua Mayfield replaced Mark Wheeler as the Religious Service Administrator for the ADC and, therefore, as a named defendant in his official capacity in this lawsuit.

4.      Mr. Muhammad is seeking injunctive relief from defendants Mr. Mayfield, Mr. Andrews, and Ms. Kelley.

5.      Specifically, Mr. Muhammad seeks to have the ADC provide to him halal meals, including meat once per day, and to have the ADC certify that the food it serves complies with a halal diet.

6.      At all times pertinent, Mr. Mayfield, Mr. Andrews, and Ms. Kelley were acting under color of state law.

7.      This Court has jurisdiction pursuant to 28 U.S.C. §1343.

**Exhaustion Of Administrative Remedies**

8.      The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e), *et seq.*, requires, as a pre-condition to filing suit, that a prison inmate first exhaust all available administrative remedies in accordance with the applicable procedural rules, including deadlines. *Hammett v. Cofield,* 681 F.3d 945, 946 (8th Cir. 2012); *see* 42 U.S.C. § 1997e(a).  "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014) (quoting *Jones v. Bock,* 549 U.S. 199, 218 (2007)).

9.      "Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (citing *Jones,* 549 U.S. at 211-12).

10.      Inmates are excused from exhausting remedies "when officials have prevented prisoners from utilizing the procedures, or when officials themselves have failed to comply with the grievance procedures." *Porter*, 781 F.3d at 452.

11.      The requirement that inmates exhaust administrative remedies "hinges on the 'availability' of administrative remedies:  an inmate, that is, must exhaust available remedies, but

need not exhaust unavailable ones." *Ross v. Blake*, 136 S.Ct. 1850, 1858 (2016). "[A]ccordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to 'obtain some relief for the action complained of.'" *Id*., at 1859 (citation omitted). The Supreme Court in *Ross* "made clear, [that] an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*., at 1859 (citation omitted).

12. The ADC maintains an inmate grievance policy, described in Administrative Directive ("AD") 12-16.[2] This grievance policy applies to all inmates and provides an administrative mechanism for resolution of complaints, problems, and other issues.

13. The ADC's grievance policy requires that an inmate submit an informal grievance in the form of a written complaint that is specific as to the substance of the issue and describes how the policy or incident affected the inmate. AD 12-16, at IV(E). Inmates have 15 days after the occurrence of an event in which to file an informal resolution. *Id.* If a problem solver fails to meet with the inmate regarding the informal resolution, step two, the formal grievance must be filed no later than six working days from the submission of the informal resolution. *Id.* Once the formal grievance is filed, an inmate will receive a written response from the Warden/Center Supervisor Decision within 20 days. *Id.*, at IV(F). An inmate may appeal the unit level grievance decision within five working days to the appropriate Chief Deputy. *Id.*, at IV(G).

14. Inmates must exhaust their administrative remedies as to all defendants at all levels of the grievance procedure before filing suit. *Id.*, at IV(N).

---

[2] AD 12-16 superseded AD 10-32; AD 10-32 was admitted into evidence at trial as defendant's Exhibit 19. AD 12-16's effective date was May 28, 2012 (Dkt. No. 52, Ex. 4). All of Mr. Muhammad's grievances were filed after the adoption of AD 12-16 (*Id.,* ¶ 5).

15.     Mr. Muhammad filed this lawsuit on April 22, 2015 (Dkt. No. 2), and prior to filing suit, Mr. Muhammad filed four grievances concerning his religious diet needs.

a.      On or about January 25, 2013, Mr. Muhammad filed grievance number VSM13-00336.  Pl.'s Trial Ex. 1.  The Warden and Ms. Yolanda Clark responded.  This grievance was fully exhausted.  Pl.'s Trial Ex. 1.

b.      On or about August 23, 2013, Mr. Muhammad filed grievance number VSM13-03225.  Pl.'s Trial Ex. 2.  This grievance was rejected as untimely.  Mr. Muhammad filed his informal resolution on August 12, 2013, and failed to file the Step Two formal grievance within six days.  Defendants failed to come forward with what would be a complete copy of this administrative grievance.  Testimony from Barbara Williams on cross examination and redirect examination indicated the document likely would be housed within the ADC at the unit level and that Mr. Muhammad likely would have had a copy. The second page, which is in evidence, states on its face that the ADC considered and rejected the grievance.  Regardless, based on the requirements of the ADC, this grievance was not fully exhausted.  Pl.'s Trial Ex. 2.

c.      The third grievance filed by Mr. Muhammad was grievance VSM13-03485. Pl.'s Trial Ex. 2.  The Unit Level Grievance Form for this grievance was not produced at trial.   From the Warden/Center Supervisor's Decision, the Court determines that Mr. Muhammad's complaint in this grievance was substantially similar to the grievance filed on August 23, 2013.  According to the trial testimony on redirect examination of Ms. Williams, Mr. Muhammad failed to exhaust fully this grievance.

d.      On or about February 6, 2014, Mr. Muhammad submitted a grievance, grievance number VSM14-491.  Pl.'s Trial Ex. 4.  In his grievance, Mr. Muhammad cited

the cases of *Love* and *Fegans*, cases he had read about in the prison law library, and cited the Federal Bureau of Prisons common fare program. Based on Mr. Muhammad testimony on direct examination, he understood, based on his reading, that these sources called for kosher meals, as the requirements for kosher meals are stricter than for halal meals, and included some form of meat. In his grievance, Mr. Muhammad specifically cited Program Statement 4700.4(2) and 4700.4(3), which are references to the Federal Bureau of Prisons Program Statements regarding the Food Service Manual. Pl.'s Trial Ex. 4. Mr. Muhammad's grievance contended, in part, that by "being forced to eat non-Halaal foods we have been forced to sin against Allah's laws." This grievance was fully exhausted, with the ADC representative signing it April 14, 2014.

16. The Court takes judicial notice of the case of *Kelvin Ray Love v. Marvin Evans, et al.*, Case No. 2:00-cv-0091 JMM, and specifically takes judicial notice of docket entries 118 and 183 in that case. In *Love*, the Court ordered the ADC to provide to Mr. Love a kosher diet consistent with his religious beliefs, and the ADC proposed, among other alternatives, to provide to Mr. Love prepackaged kosher meals from My Own Meals, Inc.

17. The Court also takes judicial notice of the case of *Michael J. Fegans v. Larry Norris, et al.*, Case No. 4:03-cv-00172 JMM, 2006 WL 6936834 (E.D. Ark. Aug. 25, 2006), *aff'd* 537 F.3d 897 (8th Cir. 2008). In *Fegans*, the Court determined in part that the ADC failed to accommodate Mr. Fegans' request for a kosher diet, that this failure placed a substantial burden on Mr. Fegans's religious beliefs, and that defendant Larry Norris of the ADC knowingly violated established law requiring kosher diets after the Court's decision in *Love*.

18. Before the common fare option was developed, according to the testimony of Kay Skillen on cross examination, the ADC utilized My Own Meals, Inc., which included kosher meat

and which is referenced in the *Love* case. *Love*, Dkt. No. 183, at 6. By comparison, according to Ms. Skillen, the common fare option does not include kosher or halal meat.

19. In addition to the grievance procedure in AD 12-16, the ADC has also promulgated AD 13-83, religious diets, which states that "any inmate requesting special religious diet will complete the Special Religious Diet form at which time all dietary requirements must be set forth by the inmate and are not subject to additions or deletions for a period of twelve (12) months." Pl.'s Trial Ex. 8, ¶ II.A. "A request based upon an inmate's sincerely held religious belief will be accommodated . . . . Requests which are not matter of a religious belief … will not be honored." *Id.*, ¶ II.C.

20. AD 13-83 is a specific procedure by which inmates can request a special religious diet. AD 13-83 was promulgated after the effective date of AD 12-16, the grievance process.

21. According to the testimony of Ms. Kelley on recross examination, requests made pursuant to AD 13-83 are received by the chaplain. AD 13-83 specifies no appeal process. It does not state that an inmate must initiate the formal grievance process in order to challenge a decision not to accommodate the inmate's purported sincerely held religious belief. Ms. Kelley on cross and redirect examination and Mr. Mayfield on direct examination testified generally that, if an inmate is not satisfied with the response he receives from the chaplain, the inmate can file a grievance. There is no record evidence to support how this information, the requirement to file a grievance if unsatisfied with a response from the chaplain, was communicated to inmates or whether this information appears in writing in any ADC document.

22. Mr. Muhammad's trial exhibits contain three memoranda from his unit's chaplain regarding Mr. Muhammad's requests for accommodation. Pl.'s Trial Exs. 3, 5, 6. The first

response is dated November 21, 2013. Pl.'s Trial Ex. 3. The second response is dated August 12, 2014. Pl.'s Trial Ex. 5. The third response is dated April 1, 2015. Pl.'s Trial Ex. 6.

23.     Mr. Muhammad testified on direct and cross examination that, in his letters to his unit chaplain, he asked for halal meat, and in his second letter, he tried to compromise by also saying he would be satisfied with the vegetarian diet with the fish added.

24.     No one produced Mr. Muhammad's letters to his unit chaplain, and the unit chaplain or chaplains who received his letters did not testify.

25.     The August 12, 2014, response specifically denies Mr. Muhammad's request to receive a vegetarian meal in addition to fish. Pl.'s Trial Ex. 5.

26.     Mr. Muhammad testified on cross examination that, after he received the first response dated November 21, 2013, stating that the ADC did not provide kosher or halal meals to inmates, he wrote a grievance, which is grievance number VSM14-491 and which was fully exhausted.

27.     During the time Mr. Muhammad filed four grievances and submitted three requests for accommodation pursuant to AD 13-83, no one from the ADC ever spoke to Mr. Muhammad about his grievances or his requests for accommodation and a halal diet. The ADC grievance procedure states that "after receipt of the informal complaint, the problem-solver will. . . meet with the inmate within three working days to resolve the issue." Pl.'s Trial Ex. 7, at 24. Dkt. No. 52, Ex. 4, at 24.

28.     Based on testimony presented to the Court by Mr. Mayfield on cross examination and Ms. Skillen on direct and cross examination, the Chaplaincy Service and the Food Service Department at the ADC were not able or authorized to grant pre-suit the relief Mr. Muhammad seeks. *See also* Pl.'s Trial Ex. 6.

29.     Based on testimony presented to the Court by Ms. Skillen on redirect examination, the ADC management team would likely have to review whether to provide new or different foods.

30.     Based on the evidence before the Court, at the pertinent time, the ADC responded to requests for religious dietary accommodations only by offering the vegetarian or common fare options. *See* Pl.'s Trial Ex. 6.

31.     Mr. Muhammad contends that the vegetarian option includes butter and animal products and that the common fare does not include meat.[3]

32.     Because AD 13-83 specifies no appeal process, because it was promulgated after AD 12-16, and because the specificity of AD 13-83 overrides the generality of AD 12-16; based on the content of the grievances Mr. Muhammad filed and exhausted prior to filing suit; and based on the totality of the circumstances presented here regarding Mr. Muhammad's grievances and requests for accommodation, the Court concludes defendants have failed to prove the affirmative defense of nonexhaustion.

33.     In the alternative, based on the totality of the circumstances presented here, this Court concludes that Mr. Muhammad was excused from exhausting administrative remedies prior to filing suit.

34.     The ADC failed to follow its own grievance procedures when it failed to have someone speak to Mr. Muhammad about the multiple grievances and requests for accommodation

_____

[3] In its prior Order, the Court observed that Mr. Muhammad did not dispute defendants' claim that the vegetarian and vegan plans do not contain food that is haram, although he claims those plans are not halal because they do not include halal meat (Dkt. No. 62, at 3 (citing Dkt. Nos. 45, at 2; 47, at 4)). Based upon his testimony on direct examination, he appears to have altered his position at trial by claiming the vegetarian option includes butter and animal products, which may be haram.

he filed prior to filing this suit. The ADC may not now complain that it did not understand the nature of Mr. Muhammad's requested accommodation.

35. Further, based on the evidence before the Court, following the ADC grievance procedure would not have provided a remedy to Mr. Muhammad. The Court reaches this conclusion based on the ADC's conduct regarding requested religious dietary accommodations in *Love* and *Fegans* and, more specifically, based on the response Mr. Muhammad received to his requests for a religious dietary accommodation in 2014 that rejected his request to receive a vegetarian meal in addition to fish. Pl.'s Trial Ex. 5.

36. The Court also reaches the conclusion that following the ADC grievance procedure would not have provided a remedy to Mr. Muhammad because, based on the evidence before the Court, at the pertinent time, the ADC responded to requests for religious dietary accommodations only by offering the vegetarian or common fare options. *See* Pl.'s Trial Ex. 6. Based on testimony presented to the Court by Ms. Skillen on redirect examination, the ADC management team would likely have to review whether to provide new or different foods. No record evidence identifies the members of the ADC management team. Further, no record evidence identifies whether members of the ADC management team participate in the grievance process such that a request for new or different foods would be reviewed at the appropriate level to provide relief in response to such a request. Ms. Skillen testified that she is not on the ADC management team. Ms. Kelley testified on direct examination that none of the grievances come to her office; the grievances are answered by the Deputy Director level if the grievances are exhausted.

37. For all of these reasons, the Court will not dismiss this case based on an alleged failure to exhaust administrative remedies.

**Protection Of Religious Exercise In Land Use And By Institutionalized Persons Act**

38.     The RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person– (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).

39.     Mr. Muhammad bears the initial burden of showing that the ADC's refusal to provide halal meat "implicates his religious exercise." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015).

40.     The RLUIPA broadly defines "religious exercise" as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).

41.     The protection of RLUIPA is "not limited to beliefs which are shared by all of the members of a religious sect." *Hobbs*, 135 S. Ct. at 862-63.  While this definition is broad, "a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation." *Id.,* at 862.

42.     Whether or not a religious belief is sincerely held is a factual determination. *Murphy v. Mo. Dep't of Corr.,* 372 F.3d 979, 983 (8th Cir. 2004).

43.     The Tenth Circuit Court of Appeals has stated that, "[w]hen inquiring into a claimant's *sincerity*, then, our task is instead a more modest one, limited to asking whether the claimant is (in essence) seeking to perpetrate a fraud on the court — whether he actually holds the beliefs he claims to hold." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014).

44.     Mr. Muhammad is a Sunni Muslim and believes that he must follow the character, morals, and examples of the Prophet Muhammad.  Mr. Muhammad converted to Islam in 2004.

45.     According to Mr. Muhammad, "halal" means permitted and "haram" means prohibited (Dkt. No. 117, ¶1).

46.     In Mr. Muhammad's view, meats from herbivorous animals that are slaughtered in accordance with a specific ritual are halal.  He believes that kosher meats are also halal.  Mr. Muhammad believes any fish is halal meat (Dkt. No. 117, ¶2).  For this reason, when the Court refers to "halal meat" in this Order, the Court refers to meats from herbivorous animals that are slaughtered in accordance with a specific ritual, kosher meats, and any fish.

47.     Mr. Muhammad believes that he should follow the Prophet's example and that, to do so, he must observe a halal diet, which he believes includes meat once a day.  The meat must be halal (Dkt. No. 117, ¶3).

48.     Mr. Muhammad declares that he is commanded by his religious beliefs to eat only food that is halal and that the dietary options offered by the ADC burden the exercise of his religion because they do not include a daily serving of halal meat.  Mr. Muhammad's basis for this belief is that he believes that the Prophet Muhammad scolded one of his followers who chose to become a vegetarian.

49.     The ADC offers inmates five basic meal options:  standard (or mainline) meals, pork-free, vegetarian, vegan, and common fare.  All were developed in consultation with a dietitian, who has verified that the meal plans meet the United States Department of Agriculture's recommended nutritional standards (Dkt. No. 117, ¶4).

50. Standard, or mainline, meals normally include a meat, vegetables, fruit, and bread. The meat served is not certified as halal. On days that pork is served, inmates who elect "pork-free" based on a religious preference may choose a non-pork entree (Dkt. No. 117, ¶5).

51. For most inmates, meals are served cafeteria style. On days that pork is served, inmates choosing "pork free" pass through first, to guard against cross contamination with pork products (Dkt. No. 117, ¶6).

52. For inmates in certain maximum security or other restrictive housing, meals are delivered to the inmates' cells (Dkt. No. 117, ¶7).

53. Mr. Muhammad has been incarcerated at the Varner Unit and the East Arkansas Regional Unit while incarcerated by the ADC. He has never been in general population at either institution; he has always been in maximum security or administrative segregation.

54. The vegetarian diet includes products from each of the United States Department of Agriculture's recommended food groups and employs legumes or a meat substitute for an entree. For vegans, soy milk is substituted for milk, and tofu is substituted for eggs (Dkt. No. 117, ¶8).

55. The common fare meal was developed by the ADC in an attempt to meet the dietary requirements of multiple religious groups. The common fare meals are not certified kosher, but the foods used are meant to meet kosher standards. Common fare meals do not contain meat (Dkt. No. 117, ¶9).

56. The common fare diet consists of products from each of the major food groups, including a meat substitute. For lunch or dinner, this typically includes beans or peas, rice or pasta, a non-starch vegetable, bread, margarine, fruit, and milk, together with eight ounces of a meat substitute entree (Dkt. No. 117, ¶10).

57. The meat substitute entree in the common fare diet is purchased by the ADC. According to the product packaging, the entree contains no beef, chicken, pork, or byproducts. The supplier labels these foods "kosher" (Dkt. No. 117, ¶10(a)).

58. Common fare meals are prepared in a separate kitchen at the ADC's Cummins Unit, where the purchased entree is combined with rice or pasta and vegetables. These products are frozen in individual containers, stored in the ADC's warehouse, and distributed to the individual units upon request. Fruit, bread, margarine, and milk are added at the individual prison units when the meal is served (Dkt. No. 117, ¶10(b)).

59. The ADC does not offer halal meat as part of its regular meals (Dkt. No. 117, ¶12). However, the ADC currently does serve fish in certain of its meal rotations.

60. Mr. Muhammad cited in an exhausted grievance the *Love* and *Fegans* cases and the Federal Bureau of Prisons common fare program, which he understood based on his reading called for the ADC to serve kosher meals and included some form of meat, and Mr. Muhammad did request to eat the vegetarian meal offered by the ADC combined with a fish entree pursuant to AD 13-83. Pl.'s Trial Exs. 4, 5.

61. For short periods of time in 2014 and 2015, Mr. Muhammad elected to eat the ADC's common fare, a vegetarian diet, in order to accommodate his religious needs. Mr. Muhammad tried the vegetarian meal because he felt his religious commitment wander and "slack off" when eating the pork-free meal.

62. Mr. Muhammad quit the vegetarian diet because he found it distasteful, it gave him gas, and he started to lose weight. Mr. Muhammad stated that he would rather eat haram meat than eat the beans provided by the ADC in the vegetarian meal every day. Mr. Muhammad stated that "the beans was not seasoned, undesireable, distasteful. It was nasty."

63.     For the remainder of his incarceration, Mr. Muhammad has chosen the pork-free option.  He eats the meat provided, even though he believes it is haram.

64.     Mr. Muhammad states that he continues to eat the pork-free option because he has no other choice:  "I eat it or starve."  However, Mr. Muhammad has stipulated that the common fare and vegetarian diet plans currently offered by the ADC are nutritionally adequate and meet the United States Department of Agriculture's nationally recommended allowances for basic nutrition (Dkt. No. 117, ¶ 11).

65.     Mr. Muhammad believes that a Sunni Muslim may only eat non-halal food if he or she is on the verge of death.  Mr. Muhammad is not on the verge of death, yet he continues to consume haram meat on a regular basis.

66.     Fish products are available for purchase through the prison's commissary or canteen.  A package of tuna can be purchased from the commissary for $1.65 plus tax, lemon pepper tuna can be purchased for $1.40 plus tax, and sardines can be purchased for $1.08 plus tax.  Def.'s Trial Ex. 4.

67.     The prison's commissary or canteen is separate and not a part of the ADC food services department, according to the testimony of Tina Deen on cross examination.  As a result, AD 13-83 and AD 13-98 do not apply to the commissary.  Instead, AD 16-41 applies to commissary.

68.     Mr. Muhammad has not opted to meet his religious needs by purchasing fish from the commissary.  From January 1, 2015, to January 1, 2017, Mr. Muhammad only purchased fish products from the commissary on two occasions.  Def.'s Trial Ex. 12.

69.     Since August 2, 2001, Mr. Muhammad has spent more than $4,200.00 in the commissary.  Def.'s Trial Ex. 11.  Of that amount, he has spent less than $200.00 for meat and fish

products. *Id.* By comparison, Mr. Muhammad has spent more than $2,400.00 for cookies, candies, condiments, chips, cereal, and other non-meat or fish products. *Id.*

70.     According to Ms. Deen's testimony on cross examination, there is either a 40% or 50% markup on items available for purchase in the prison commissary, with the additional funds charged benefiting an indigent program.

71.     Evidence from Ms. Deen indicates that ADC commissary managers or employees are responsible for marking items as kosher or halal on commissary lists and that they rely on the vendor to indicate whether items are kosher or halal. These commissary lists change from time to time. The available lists, including those sometimes relied on by Mr. Muhammad, included contradictory markings. For example, Ramen noodles, about which defendants specifically asked Mr. Muhammad, are marked kosher on at least one list available to Mr. Muhammad. Pl.'s Trial Ex. 12.

72.     Mr. Muhammad also testified that some commissary purchases were made for trade with other inmates, so it may be inappropriate for this Court to assume, or for defendants to suggest, that Mr. Muhammad consumed all items he purchased through the commissary. The Court, like Mr. Muhammad, acknowledges this practice of trading with other inmates violates ADC rules but is part of inmate culture.

73.     While Mr. Muhammad's actions have not been a perfect exemplar of his beliefs, the Court does not believe that Mr. Muhammad is seeking to perpetrate a fraud on the Court by requesting halal meat once per day in addition to the vegetarian or common fare meal provided by the ADC. Mr. Muhammad has been a practicing Muslim for more than a decade and has made multiple requests for a halal diet, which he believes includes a daily serving of halal meat. His

requested accommodations under AD 13-83 further confirm this. The Court finds that Mr. Muhammad has a sincere religious belief that he should consume halal meat once daily.

74.     Mr. Muhammad must also show the ADC's refusal to provide halal meat "substantially burdened that exercise of religion." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015).

75.     In *Patel v. United States Bureau of Prisons*, the Eighth Circuit Court of Appeals appeared to create a standard by which one could determine whether a prison regulation would burden substantially a prisoner's free exercise of religion. 515 F.3d 807, 813 (8th Cir. 2008). When applying this standard in the light of *Hobbs*, the Court determines that, in order to constitute a substantial burden under RLUIPA, a regulation must significantly inhibit or constrain religious expression; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in religious expression.

76.     While "the availability of alternative means of practicing religion is a relevant consideration" regarding First Amendment claims,[4] it is not relevant to claims under the RLUIPA. *Hobbs*, 135 S. Ct. at 862.

77.     Of the courts that have addressed the issue, many have found that requiring non-indigent inmates to purchase halal or kosher items from the commissary to substitute their religious

---

[4] Based on evidence before the Court, including testimony from Mr. Mayfield, the ADC provides other accommodations for the religious practices of inmates who identify as Muslims. These include allowing inmates to attend Friday prayers and time off from work to attend; the right to keep religious texts, a prayer rug, and a kufi in an inmate's cell; the observation of Ramadan, including fasting and service of meals before sunrise and after sunset; and feasts to celebrate Eid Al-Fitr and Eid Al-Adha. Mr. Muhammad further acknowledges that, due to his circumstances, he is excused from some religious observances, such as Friday prayer, attending Mosque, and making a Pilgrimage. He distinguishes those observances, which are not available to him while he is incarcerated and specifically in restrictive housing, from the religious dietary accommodations he seeks on the basis that the food he requests is available, just not provided.

diet is not a substantial burden. *See Patel,* 515 F.3d at 814; *Baines v. Hicks,* Civil Action No. 3:14CV616, 2016 U.S. Dist. LEXIS 176116, at *33 n.23 (E.D. Va. Dec. 19, 2016).

78. However, when the inmate is indigent, purchasing items from the commissary is not a realistic option. *Love v. Reed,* 216 F.3d 682, 689 (8th Cir. 2000) (where the prisoner was indigent and generally unable to buy such food, the option was essentially unavailable.); *Tatum v. Meisner*, No. 13-cv-44-wmc, 2016 U.S. Dist. LEXIS 8642, at *23 (W.D. Wis. Jan. 26, 2016) ("defendants have not established as a realistic option under RLUIPA unless (1) funding for purchases is offered by the institution for those who cannot otherwise afford it; and (2) the canteen contains appropriate food options."); *see Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1317 (10th Cir. 2010) ("any ability to purchase is chimerical where a plaintiff is indigent").

79. Other courts have held that a denial of religiously sufficient food, where food is a generally available benefit, constitutes a substantial burden on the exercise of religion indigent or not. *Moussazadeh v. Texas Dept. of Criminal Justice*, 703 F.3d 781, 793 (5th Cir. 2013); *see, Johns v. Lemmon,* 980 F. Supp. 2d 1055, 1059 (N.D. Ind. 2013) ("requiring [plaintiff] to pay for his Sabbath food, thereby denying him an essential benefit that is provided to all prisoners, in order to practice his faith, is a substantial burden on his religious exercise. Defendants' policy amounts to a fine on Plaintiff for abiding by a tenet of his faith.").

80. Here, the ADC has refused to provide Mr. Muhammad with a daily serving of halal meat. Pl.'s Ex. 5.[5]

---

[5] The Court notes that, at the bench trial, Ms. Kelley stated on cross examination that it would not be a problem to provide Mr. Muhammad with a serving of fish once per day in addition to the vegetarian meal. The Court observes that, had the ADC communicated thoroughly with Mr. Muhammad with respect to his grievances and requests for accommodation before he filed suit, including but not limited to his 2014 AD 13-83 request, this lawsuit may have been avoided, since Ms. Kelley states under oath that the ADC is willing and able to accommodate Mr. Muhammad's religious diet request.

81.     Mr. Muhammad has no source of personal income (Dkt. No. 117, ¶ 20). He relies on the benevolence of friends and family members for funds to purchase items from the commissary. While $6,603.91 may have been deposited into Mr. Muhammad's account over the last six years (Dkt. No. 117, ¶20), there is no guarantee that these deposits will continue. Def.'s Ex. 8.

82.     As of May 16, 2017, Mr. Muhammad's bank account balance was $10.53. Def.'s Trial Ex. 9. According to Ms. Deen, inmates are considered indigent when their balance stays under $9.99 for 30 days. When this occurs, inmates are provided with $12.00 for the purchase of hygiene items. Indigent inmates are restricted from purchasing food items.

83.     Unless Mr. Muhammad receives additional deposits into his bank account, he will fall below the account balance required to prevent indigence upon his next purchase of commissary goods that exceeds $0.54. At that point in time, he will be prohibited from purchasing food items from the commissary, leaving him no way to supplement his diet.

84.     In addition, as an inmate in restrictive housing, Mr. Muhammad acknowledges that he is prohibited from spending more than $10.00 per week at the commissary. The cheapest fish option available in the commissary is sardines at $1.08 plus tax. Def.'s Trial Ex. 4. If Mr. Muhamad purchases just one serving of sardines a day for seven days, in order to supplement the vegetarian or common fare diet, it would require him to spend $7.56 plus tax. This leaves Mr. Muhammad less than $2.50 each week for personal hygiene items before tax. Assuming a sales tax rate of nine percent, that amount decreases to $1.75 each week. In the East Arkansas Regional Unit Max Commissary, dental floss alone costs $2.69, Speed Stick deodorant costs between $2.32 and $3.22, and toothpaste costs $2.41. *Id.*

85. The Court finds that the ADC's refusal to provide Mr. Muhammad with a daily serving of halal meat places a substantial burden on Mr. Muhammad's religious exercise.

86. The burden now shifts to Mr. Mayfield, Mr. Andrews, and Ms. Kelley, who must show that the ADC's policy "furthers a compelling government interest and there are no less restrictive means of furthering that interest." 42 U.S.C. § 2000cc-1; *Native Am. Council of Tribes v. Weber*, 750 F.3d 742, 749 (8th Cir. 2014).

87. Defendants have failed to prove that the ADC's policy meets this high bar. Ms. Kelley testified that the ADC could accommodate Mr. Muhammad's request to have fish once per day in addition to the vegetarian or common fare meal.

> Ms. Kelley: And I heard him say he wasn't asking for anything that we didn't already have on hand, so meaning we could use the mackerel or whatever fish we had in the kitchen to add to his plate once a day that, that would meet his needs. Yes. That's what I heard him say.
>
> Mr. Askew: You said the department could do that?
>
> Ms. Kelley: Yes. I did.

88. Defendants cite to *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal,* to assert that "the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." 546 U.S. 418, 435 (2006). Defendants state that they "cannot be reasonably expected to provide unique meals for selected inmates. . . . No inmate receives specialized foods" (Dkt. No. 127, at 11). Defendants also state that providing Mr. Muhammad with "unique foods will increase the ADC's costs, potentially by a substantial amount" and open up the ADC to potential Establishment Clause problems (*Id.*, at 12-13).

89.     In support of these arguments are the following record facts.  Mr. Muhammad's date of birth is July 9, 1985 (Dkt. No. 117, ¶17).  According to the 2010 National Vital Statistics Report of the Centers for Disease Control and Prevention, an African American male has a life expectancy of 71.8 years (Dkt. No. 117, ¶18).  Defendants rely on these figures to approximate the cost of providing to Mr. Muhammad a different diet for the anticipated remainder of his life which will be spent in the ADC.

90.     Between 2003 and 2008, the ADC attempted to accommodate the needs of a kosher diet through meals that included pre-packaged kosher meats and starches.  These meals cost about $5.45 per meal.  The ADC provided two such meals per day to each inmate who requested a kosher diet.  These meals were replaced by the common fare option (Dkt. No. 117, ¶19).

91.     In the 12 months preceding August 2017, the ADC's Central Warehouse shipped 1,225 common fare meals in 49 cases to the ADC's prison units.  Each case contains 25 meals (Dkt. No. 117, ¶21).

92.     As of early April 2017, approximately 93 ADC inmates had identified themselves as Jewish, and 1,711 had identified themselves as Islamic/Muslim (Dkt. No. 117, ¶13).

93.     As of early April 2017, eight of the 93 inmates who identified themselves as Jewish had requested kosher diets (Dkt. No. 117, ¶15).

94.     As of early April 2017, Mr. Muhammad is the only Islamic or Muslim inmate who has requested a halal diet (Dkt. No. 117, ¶14).

95.     In analyzing the ADC's arguments, the Court notes that, first, Mr. Muhammad does not request specialized or unique foods.  Mr. Muhammad has asserted that receiving one serving of fish each day that the ADC already purchases and serves on a regular basis would satisfy his

religious exercise needs. Moreover, Ms. Kelley admitted that the ADC could accommodate this request.

96.     In addition, even if Mr. Muhammad had specifically requested halal chicken or beef, Plaintiff's Trial Exhibit 33 shows several instances where halal chicken or beef is actually cheaper than the non-halal chicken or beef currently served. It is not clear that serving to Mr. Muhammad halal chicken or beef once per day would cost more than serving to him the standard or mainline meals the ADC currently serves. Defendants state that these calculations reflect a discounted price because the product is frozen, but defendants fail to explain why purchasing frozen halal chicken or beef would not be a reasonable alternative (Dkt. No. 127, at 12). The Court acknowledges that, based on the testimony of Ms. Skillen on direct examination, the ADC utilizes a bid process to obtain food from vendors and that no existing contract with a vendor includes halal chicken or beef. The ADC contacted only one vendor to acquire information for trial without verifying whether lower cost options are available from other vendors.

97.     Defendants further state that the ADC's current meal options meet the needs of most Muslims and are consistent with the ADC's Muslim chaplain's understanding of a proper diet (Dkt. No. 127, at 13). In response, the Court reiterates that the protection of RLUIPA is "not limited to beliefs which are shared by all of the members of a religious sect." *Hobbs*, 135 S. Ct. at 863.

98.     Finally, defendants state that there are some security concerns regarding personalized meals. Mr. Muhammad's meals are prepared by other inmates and brought to him in his single person cell. While the inmates do not know to which inmate a specialized meal is sent, there have been instances of food based retaliation and injury.

99.     The Court finds that these security concerns do not rise to the level of a compelling interest as required by RLUIPA.  According to ADC documents and Ms. Skillen's testimony on direct examination, numerous inmates receive specialized meals on a daily basis without incident. *See* Def.'s Ex. 21 (meals available include: regular, vegetarian, high calorie/high protein, low cholesterol, medium cholesterol, high cholesterol, cardiovascular, and two grams of sodium).

100.     The Court finds that defendants have failed to assert a compelling interest.  As such, defendants' refusal to accommodate Mr. Muhammad's request to receive halal meat once per day is a violation of RLUIPA.

**The Free Exercise Clause Of The First Amendment Of The United States Constitution**

101.     "To be valid, 'a prison regulation [which] impinges on inmates' constitutional rights . . . [must be] reasonably related to legitimate penological interests.'  This level of scrutiny ensures that 'prison administrators, and not the courts, [] make the difficult judgments concerning institutional operations.'  There are four relevant factors in determining the reasonableness of the regulation:  (1) whether there is 'a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;' (2) 'whether there are alternative means of exercising the right that remain open to prison inmates;' (3) 'the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;' (4) and whether there exist alternatives to accommodate the prisoner with a *de minimis* cost."  *Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015) (internal citations omitted).

102.     Defendants have established a rational connection between the prison regulation and the legitimate governmental interest put forth to justify it.  The ADC currently prepares approximately 40,000 meals per day (Dkt. No. 127, at 11).  Providing for Mr. Muhammad's

personal religious dietary request could become cumbersome, especially if several of the 1,700 Muslim inmates make the same dietary request. Accordingly, the first factor tips in favor of defendants.

103. There are no alternative means available that would ensure Mr. Muhammad daily access to halal meat. While Mr. Muhammad could purchase food from the commissary when he has funds available to do so, there is no guarantee that he would have such funds on any given day. In addition, while defendants assert that Mr. Muhammad could elect the regular meal on the days that fish is served and eat the vegetarian meal when fish is not served, the ADC's religious meals policy states dietary requirements are not subject to additions or deletions for a period of 12 months once a diet request has been made. Pl.'s Trial Ex. 8. Unless Mr. Muhammad received a special designation or permission to receive the vegetarian meal as well as fish, this is not a viable alternative under current policy. Moreover, the ADC denied this exact request in 2014. *See* Pl.'s Trial Ex. 5. The Court finds this alternative unpersuasive. Defendants refused Mr. Muhammad's dietary request to combine fish with the vegetarian meal prior to litigation, and they cannot now assert that this option is available as an "alternative means." The second factor tips in favor of Mr. Muhammad.

104. Providing Mr. Muhammad with a daily serving of halal meat will have a negligible impact on guards and other inmates and on the allocation of prison resources generally. Ms. Kelley has already stated that the ADC could feasibly accommodate Mr. Muhammad's request by providing him with a daily serving of fish in addition to the vegetarian meal. The third factor tips in favor of Mr. Muhammad.

105. Here, a reasonable alternative with a *de minimis* cost clearly exists. Mr. Muhammad has requested daily halal meat in addition to the vegetarian meal. Ms. Kelley has

stated that the ADC can accommodate this request by providing Mr. Muhammad with a serving of fish of the type currently purchased and served by the ADC, once per day. The fourth factor tips in favor of Mr. Muhammad.

106. The Court finds that the ADC's refusal to provide Mr. Muhammad with a daily serving of halal meat is not reasonably related to legitimate penological interests. Mr. Muhammad's request can be satisfied at a *de minimis* cost to the ADC and with little impact on the ADC's guards and other inmates by providing Mr. Muhammad with a daily serving of fish of the type currently purchased and served by the ADC. Moreover, there are no other alternative means available that would ensure Mr. Muhammad access daily to halal meat.

107. Following the bench trial, and having considered the entire record and the findings of fact and conclusions of law set out above, the Court finds that Mr. Muhammad is entitled to injunctive relief.

108. The parties are directed to confer in good faith to arrive at a solution which will provide Mr. Muhammad with a halal diet that includes one daily serving of halal meat consistent with this Order. The Court leaves it to the parties to work out the details, but the ADC is hereby directed to evaluate any and all options, including options never before considered by the ADC, to comply with the terms of this Order. Any proposed diet should be reviewed by the ADC's dietician for nutritional assessment.

109. The parties shall confer, negotiate in good faith, and report back to the Court their proposal consistent with this opinion. The Court directs the parties to submit a written status report within 15 days from the entry of this Order.

It is so ordered this the 30th day of March, 2018.

_____
Kristine G. Baker
United States District Judge